## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re<br><br>STRATA ENERGY SERVICES INC.,<br><br>Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 15-_____ |
| In re<br><br>STRATA SERVICES INTERNATIONAL INC.,<br><br>Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 15-_____<br><br>Recognition and Joint<br>Administration Requests Pending |

## DECLARATION OF KEN PEARL
## IN SUPPORT OF VERIFIED PETITIONS
## FOR RECOGNITION OF CANADIAN PROCEEDING UNDER
## CHAPTER 15 AND MOTION FOR ORDER GRANTING RELATED RELIEF

I, Ken Pearl, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.      I am a natural person over the age of 18, a citizen of Canada, and, if called upon, could testify to all matters set forth in this declaration.

2.      I am a Senior Vice President at The Fuller Landau Group Inc., the appointed receiver and duly authorized foreign representative (the "Petitioner") of Strata Energy Services Inc. ("Strata Energy") and Strata Services International Inc. ("Strata International" together with Strata Energy, "Strata" or the "Debtors") in a proceeding (the "Canadian Proceeding") under section 243 of the *Bankruptcy and Insolvency Act*, R.S.C.

1985, c. B-3, as amended (the "BIA") before the Court of Queen's Bench of Alberta,

Judicial Centre of Calgary (the "Canadian Court").

3.      Matters stated in this declaration that are statements of fact and that are

based upon my personal knowledge are true and correct.   Matters stated in this

declaration that are statements of fact and that are not based upon my personal knowledge

but that are derived from documents or information supplied to me are true to the best of

my information and belief.

4.      I am a Chartered Insolvency and Restructuring Professional and specialize

in corporate workouts, bankruptcy, and other insolvency matters.   I am a Senior Vice

President in the accounting and advisory firm The Fuller Landau Group Inc. and, since

June 2015, have been a part of the insolvency practice of The Fuller Landau Group Inc.

Before joining The Fuller Landau Group Inc., I worked as a Restructuring Professional at

Deloitte & Touche LLP and later BDO Canada LLP.   I have been practicing in the area of

corporate workouts, bankruptcy and insolvency for 20 years, acting as a receiver,

monitor, and/or bankruptcy trustee for domestic and foreign clients, as well as advising in

respect of out-of-court liquidations.

5.      I hereby submit this declaration in support of the Debtors' verified petitions

for recognition of the Canadian Proceeding under chapter 15 of title 11 of the United

States Code (the "Bankruptcy Code") and motion for order granting relief related thereto (collectively, the "Verified Petition").[1]

## BACKGROUND

### A.     Strata's Business, Assets, Corporate Structure, and Debt Structure

6.     Business and Assets.  Founded in 2003, Strata is a global, fully integrated provider of oilfield services with a special focus on managed pressure and underbalanced drilling.   Strata provides an array of oil-and-gas products and services to its clients, including rotating flow diverters for drilling applications, surface recovery and separation systems, membrane nitrogen and compression equipment and services, light snubbing machine and services, and engineering and project management services. In addition, Strata offers oil-and-gas equipment rentals, including compressors, mist pumps, boosters, membranes, and wireline retrievable floats for drilling, workover, re-entry, and completion operations. Strata also manufactures various products for the oil and gas industry.

7.     Strata serves oil-and-gas companies and their operations throughout the world.  Strata is headquartered in Alberta, Canada and has administrative and/or auxiliary offices in the United States, United Arab Emirates, Kurdistan, and Indonesia.

8.     Corporate Structure.  Strata Energy, incorporated in 2003, is a privately held parent company incorporated pursuant to the laws Alberta, Canada (Business No. 882587603RC0001 and Alberta Corporation No. 2010525182).   To the best of the

---

[1]    Capitalized words not otherwise defined herein shall have the meaning set forth in the Verified Petition.

Petitioner's knowledge based upon its review of Strata's books and records, as of November 10, 2015, Strata Energy had approximately 1,848,892 common shares outstanding held by the following persons and entities:

| Shareholder | Percentage |
|---|---|
| 1052242 Alberta Ltd. | 52.25% |
| International Oil and Gas Technology Ltd. | 46.25% |
| FX Energy Group PTE Ltd. | 1.00% |
| Jason Scheyen | 1.50% |
| **Total** | **101%**[2] |

9.     Strata Energy's primary management team and headquarters are located at its registered place of business: 27312-245 TWP Rd 394, Blackfalds, Alberta T0M 0J0 Canada (the "Head Office").  Strata Energy has four directors: Miles Walker, Ken Travis, Wayne Rutherford, and Lyle Filliol.  All of Strata Energy's directors are Canadian citizens and residents.  Strata Energy has a registered branch located in Iraq, which Strata Energy uses to store, repair, and deploy the Iraq Assets (defined herein).

10.     Strata International, incorporated in 2006, is the wholly owned subsidiary of Strata Energy incorporated in Nevada (Business No. 20061797128).  Though Strata International's primary management team is located at the Head Office, it maintains an office within the United States for administrative purposes, which office is located at:

---

[2]     These numbers were pulled directly from certain documents that the Petitioner found among Strata's books and records.  Although these numbers appear inaccurate, the Petitioner is currently investigating Strata's assets and affairs, and will update the Court as necessary throughout the course of the investigation in order to correct any inaccuracies or otherwise provide additional information.

4194 West 5th Street, Cheyenne, Wyoming 82007.  Strata International has two officer-directors: Ken Travis and Lyle Filliol.  As mentioned above, Mr. Travis and Mr. Filliol are Canadian citizens and residents, and also sit on Strata Energy's board of directors.

11.    In addition to Strata International, Strata Energy owns subsidiaries in both Mexico and the United Arab Emirates:  Strata Energy Services de Mexico SA de CV ("Strata Mexico") and Strata Oilfield Servicing Management (UAE) ("Strata UAE"), respectively.  However, to the best of the Petitioner's knowledge, neither Strata Mexico nor Strata UAE currently operates a business, owns or possesses any material assets, or has any outstanding liabilities.[3]

12.    Debt Structure.[4]  Strata Energy primarily funded its operations through secured debt obtained from PNC Bank Canada Branch ("PNC Bank").  In addition, based on a preliminary review of Strata's books and records, the Petitioner believes that either Strata Energy, Strata International, or both, have or otherwise may have obtained additional secured debt from one or more of the following:  BDC Capital Inc. ("BDC Capital") and/or Wells Fargo Bank, N.A. ("Wells Fargo").

---

[3]    Strata Mexico has some cash on deposit in a Mexican bank.  Thus, the Petitioner will attempt to recover same for administration in the Canadian Proceeding.  Strata Mexico's only known liability is an intercompany payable in the amount of USD $242,000, due and owing to Strata Energy.

[4]    The Petitioner was only recently appointed receiver for Strata and has begun to diligently investigate Strata's operations and finances—including any potential claims or competing interests in Strata's assets.  However, given the early stage of the investigation and the Canadian Proceeding, the Petitioner does not have a complete understanding of Strata's finances and operations and therefore, no statement or omission herein should be construed as an admission with respect to the nature, extent, scope, and validity of any potential claim against Strata or its assets.

a. ***Strata's Secured Debt***

13.    Pursuant to that certain Credit Agreement dated August 1, 2011, between PNC Bank and Strata Energy (as amended, the "PNC Credit Agreement"), PNC Bank advanced certain funds to the Debtors (the "Advances").  To the best of the Petitioner's knowledge, under the PNC Credit Agreement, Strata Energy was at one time indebted to PNC Bank pursuant to the Advances as follows:

| Loan Type | Amount (CAD) |
|---|---|
| Revolving Advances | $4,000,000 |
| Term Loan | $22,000,000 |
| **Total** | **$26,000,000** |

14.    Pursuant to that certain Guarantee dated August 3, 2011 (the "Guarantee"), Strata International covenanted to perform all obligations owing by Strata Energy to PNC Bank under the PNC Credit Agreement.  The Advances and all other amounts advanced under the PNC Credit Agreement and the Guarantee were secured by (i)(a) that certain grant of security pursuant to the terms of the PNC Credit Agreement, (b) that certain General Security Agreement dated August 3, 2011 (the "GSA"), and (c) that certain IP Security Agreement dated July 31, 2014 executed by Strata Energy in favor of PNC Bank (together with the GSA, the "Borrower Security")  and (ii) that certain security agreement dated August 3, 2011 executed by Strata International in favor of PNC Bank (the "Guarantor Security" together with the Borrower Security, the "Security").

15.    To the best of the Petitioner's knowledge, Strata Energy used certain portions of the Advances under the PNC Credit Agreement to fund its US operations conducted through Strata International.

16.    In addition to the PNC Credit Agreement, it appears that the assets of Strata Energy, Strata International, or both, are or otherwise may be subject to liens and/or security interests held by BDC Capital, and/or Wells Fargo.   To the best of the Petitioner's knowledge, pursuant to certain loan documents, BDC Capital holds a claim against Strata in the amount of CAD $5 million (the "BDC Indebtedness") secured by certain of Strata Energy's intellectual property and life-insurance policies.   As for Wells Fargo, same filed a statement asserting a security interest and/or lien with respect to the assets of Strata International.   However, the Petitioner has not yet determined (i) the nature, scope, or validity of Wells Fargo's alleged security interest and/or lien or (ii) the amount (if any) of any alleged claim held by Wells Fargo.

### b. *The Intercreditor Agreement*

17.    On March 30, 2012, PNC Bank, BDC Capital, and Strata entered into that certain Inter-creditor Agreement (the "Intercreditor Agreement").   Pursuant to the Intercreditor Agreement, PNC Bank agreed to partially subordinate its Security to BDC's security interest with respect to certain intellectual property and life-insurance proceeds. Further, in conjunction with the Intercreditor Agreement, the parties executed that certain license agreement (the "License Agreement"), which agreement is effective given the commencement of a receivership proceeding regarding Strata Energy.   The License

Agreement provides PNC Bank with the limited right to use certain intellectual property to complete any of Strata's ongoing projects.

### c. *The Shareholder Note*

18.     In addition to the above secured debt discussed above, to the best of the Petitioner's knowledge based on its preliminary review of Strata's books and records, in August 2011, Strata Energy executed a USD $2 million promissory note (the "Shareholder Note") in favor of shareholder International Oil and Gas Technology Ltd. ("OGT").  The Shareholder Note was provided to OGT in connection with the conversion of certain debentures, which were initially set to mature in August 2012.   The Shareholder Note bears interest at 4.00% per annum and matured on November 30, 2012. However, to the best of the Petitioner's knowledge, as of November 10, 2015 the Shareholder Note had not been paid and Strata Energy and OGT had not negotiated terms for the Shareholder Note's extension or repayment.

### B.     Strata's Financial Difficulties

### a. *Global Market Challenges*

19.     Between 2013 and 2014, Strata's financial condition began to rapidly deteriorate due, in large part, to macroeconomic conditions.  Declining oil prices and reduced demand for oil have taken a toll on the global oil-and-gas industry, and forced a number of Strata's clients to scale back—and in some cases, cease—operations.  Industry conditions similarly drove down pricing and demand for Strata's services and further intensified competition within the oilfield-services space.   As a result, Strata soon

encountered significant cash-flow problems, and struggled to generate enough cash to both maintain its operations and service its debt.

### b.  *PNC Bank's Demand for Payment and Forbearance*

20.     In December 2014, Strata Energy breached certain financial covenants under the PNC Credit Agreement and defaulted thereunder.  PNC Bank notified Strata of the default by letters dated January 26, February 6, and March 30, 2015.[5]

21.     Accordingly, on May 29, 2015, PNC Bank issued demands and notices of its intention, in accordance with section 244 of the BIA, to (i) enforce its Security and (ii) accelerate the indebtedness under the PNC Credit Agreement, to both Strata Energy and Strata International in respect of the PNC Credit Agreement, the Guarantee, and the Security.

22.     Shortly thereafter, PNC Bank and Strata executed that certain forbearance agreement effective June 1, 2015 (the "Forbearance Agreement") for the purpose of allowing Strata time to complete a sale of some or all of its assets, specifically, certain of Strata's assets located in Iraq (the "Iraq Assets").  Under the Forbearance Agreement, Strata Energy was required to obtain a commitment for the sale of the Iraq Assets on or before June 30, 2015.  The proceeds of any such sale were to be used to reduce the PNC Indebtedness (defined below) under the PNC Credit Agreement.

---

[5]     In addition, as of June 2015, Strata Energy breached certain financial covenants in connection with its obligations to BDC, which constituted an additional event of default under the PNC Credit Agreement.

23.     Further, pursuant to the Forbearance Agreement, Strata Energy and Strata International each (i) acknowledged receipt of PNC Bank's demand for payment and waived any other right to notice or demand from PNC Bank and (ii) executed a consent order providing for the commencement of a receivership in the event of termination of the Forbearance Agreement.  In addition, under the terms of the Forbearance Agreement, PNC Bank released to Strata Energy $400,000 from a reserve established in connection with the PNC Credit Agreement in order to fund the sale of the Iraq Assets.

24.     Strata Energy failed to obtain a commitment with respect to the sale of the Iraq Assets by the applicable deadline, and in addition, the Forbearance Agreement expired by its terms on September 1, 2015.  PNC Bank did not agree to extend the terms of the Forbearance Agreement or otherwise advance additional funds under the PNC Credit Agreement.

25.     As of November 10, 2015, the indebtedness owing by Strata Energy under the PNC Credit Agreement and Forbearance Agreement total $22,506,223 plus fees and costs (the "PNC Indebtedness").

### c. *The Attempted Sale of Strata Energy's Assets*

26.     In December 2014, Strata engaged Cronus Partners LLC ("Cronus") for the purpose of pursuing a material transaction, including but not limited to, the potential sale of some or all of Strata's assets, a refinancing, or other recapitalization.  Unfortunately, Cronus failed to identify an acceptable offer to explore or consummate any such material transaction.   Consequently, on May 21, 2015, Strata terminated its engagement of Cronus.

27.     After Cronus was terminated, Strata began attempting to facilitate a sale of some or all of its assets through an informal process.  Despite some interest, Strata has not procured a firm offer from any potential purchaser.

### C.     The Canadian Proceeding

28.     <u>Commencement</u>.  Between July and August 2015, PNC Bank and Strata continued to engage in discussions regarding Strata's various defaults and PNC Bank's concerns regarding Strata's financial circumstances.   The parties could not reach a resolution.  Further—based on my review of certain books and records—I determined that, since August 2015, Strata Energy had experienced a cash burn of more than CAD $1.5 million, and further estimated that the cash burn from November 2015 through December 2015 will exceed CAD $500,000.  As a result, PNC Bank determined that Strata could not continue to manage its business or complete a formal sale process and thus, a receiver should be immediately appointed to oversee Strata's cash flow and commence a sales process.

29.     On November 6, 2015, PNC Bank filed and served notice of its originating application for the appointment of a receiver with respect to both Strata Energy and Strata International in the Canadian Proceeding.  On November 10, 2015, the Canadian Court conducted a hearing in connection with PNC Bank's receivership application and entered a the consent receivership order (the "<u>Receivership Order</u>") in the Canadian Proceeding appointing the Petitioner as receiver over all of Strata's "current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate, including all proceeds thereof" (collectively, the "<u>Property</u>").

30.     Pursuant the Forbearance Agreement, the Receivership Order was entered with Strata's consent to the terms thereof.

31.     A true and correct certified copy of the Receivership Order is attached hereto as Exhibit A.

32.     The Receivership Order.  Pursuant to the Receivership Order, the Petitioner is empowered and authorized, but not obligated, to act at once in respect of the Property, including, but not limited to:

    a.  to take possession of and exercise control over the Property and any and all proceeds, receipts and disbursements arising out of or from the Property;

    b.  to receive, preserve and protect the Property, or any part or parts thereof;

    c.  to manage, operate and carry on the business of the Debtors;

    d.  to receive and collect all monies and accounts now owed or hereafter owing to the Debtors;

    e.  to market any or all of the Property;

    f.  to sell, convey, transfer, lease or assign the Property, or any part or parts thereof, outside of the ordinary course of business;

    g.  to apply for any vesting order or other orders necessary to convey the Property or any part or parts thereof to a purchaser or purchasers thereof, free and clear of any liens or encumbrances affecting such Property;

    h.  to exercise any shareholder, partnership, joint venture or other rights which the Debtors may have; and

    i.  to take any steps reasonably incidental to the exercise of these powers or the performance of any statutory obligations,

and in each case where the Petitioner takes any such actions or steps, it is exclusively authorized and empowered to do so, to the exclusion of all other parties, including the Debtors.

33.     In addition, pursuant to the Receivership Order, the Petitioner is duly authorized and empowered to, among other things, (i) act as Strata's "foreign representative" as that term is defined in section 101(24) of the Bankruptcy Code; (ii) seek recognition of the Canadian Proceeding under chapter 15 of the Bankruptcy Code; and (iii) seek any other relief from foreign courts as the Petitioner deems just and proper.

34.     <u>Role of the Petitioner as BIA Receiver</u>.[6]  Pursuant to the BIA, the Petitioner is an independent officer of the Canadian Court and acts on behalf of all of Strata's creditors.  The Petitioner is further charged with the duty to secure and monetize Strata's assets to maximize realization for distribution to creditors entitled to same.   Also, pursuant to the BIA, the Petitioner is obligated to file reports with the Canadian Court and the Superintendent of Bankruptcy, the federal regulator in Canada, on the progress of, and major events that occur during, the Canadian Proceeding.

35.     To that end, the Petitioner is in the process of inspecting Strata's books and records, taking possession of the Property, identifying potential creditors in Canada and the US, notifying them of the Canadian Proceeding and these chapter 15 cases where necessary or appropriate, and determining the complete body of claims against the Property and their respective priority.

36.     The Petitioner is also in the process of undertaking a marketing process in respect of certain of the Property with a view to identifying one or more suitable buyers

---

[6]     For a more fulsome discussion of a BIA receivership proceeding, the Petitioner respectfully refers the Court to the Mann Declaration filed contemporaneously herewith.

and completing sale transactions in respect of the Property (any such transaction, a "Sale"). In most cases, pursuant to the Receivership Order, the Petitioner will require approval of the Canadian Court for each significant Sale and will seek from the Canadian Court a vesting order, delivering title to the assets free and clear of the claims of all creditors.

37.     The BIA Receivership Claims and Distribution Processes. The Petitioner has a duty to undertake a review of any and all secured claims, charges or liens in respect of Strata's assets. After the claims are reviewed—and on notice to Strata, PNC Bank, BDC Capital, Wells Fargo, and other parties in interest—the Petitioner will seek the Canadian Court's approval to distribute the proceeds of any Sale to secured creditors in accordance with the priority of any such claims, including the claims of the Petitioner (if any) in respect of its priority charges under the Receivership Order related to costs of administering the Canadian Proceeding. Thus, no funds or assets will be distributed to PNC Bank or others without supervision and approval of the Canadian Court.

38.     The Petitioner currently understands that the only secured claimants in respect of Strata are PNC Bank and BDC Capital, and that Wells Fargo may hold a secured claim. However, the Petitioner continues to review Strata's books and records and other relevant sources, such as the relevant personal property security registries in the United States and Canada, to ensure all secured creditors are identified.

39.     Currently, the Petitioner does not expect any funds to remain for distribution to unsecured creditors. If any sale proceeds remain after payments are made to all identified secured creditors, the Petitioner would likely seek to conduct an

-14-

unsecured claims process under the BIA for the purpose of distributing proceeds to unsecured creditors of each Debtor on a *pro rata* basis through the Canadian Court.  I am informed that such ratable distribution is similar to what would occur under the Bankruptcy Code.  Additionally, if a creditor wishes to object to the Petitioner's adjudication of his or her claim, such creditor would have a right to be heard in the Canadian Court.[7]

40.     If such a claims process is not undertaken, unsecured creditors would retain their claims against Strata and the rights of unsecured creditors to assert their claims against Strata would be unaffected by the Receivership Order and the Canadian Proceeding.

41.     In my view, the claims process outlined above, as overseen by the Canadian Court, would be efficient in terms of the costs to Strata and diminution of funds available to creditors, fair to all creditors of Strata, whether Canadian or American, and appropriate under the circumstances.  For this reason, the Petitioner requests that this Court permit all claims to be administered under Canadian law and to be overseen by the Canadian Court in respect of secured and unsecured claims against Strata, without the requirement of an additional claims process to be run through these chapter 15 cases (unless facts later determined require it).

---

[7]     In the event a US claims process is required, the Petitioner will apply for a Court order establishing such process at a later date.

-15-

**D.    The Petitioner's Marketing and Potential Sale of Strata's Assets**

42.    The Petitioner was recently been appointed receiver in the Canadian Proceeding and is in the process of investigating Strata's assets and affairs.    As mentioned above, in the past two years, Strata Energy has conducted—or otherwise attempted to conduct—both formal and informal sale processes in order to sell certain of its assets, including the Iraq Assets.  The Petitioner has hired an investment bank to run a new Sale process and hopes to identify a potential purchaser willing to serve as a stalking-horse bid.

**E.    Strata's Center of Main Interests**

43.    I am informed that a US court may apply a factor analysis to determine the center of Strata's main interests, including, among other things: the location of Strata's headquarters, the location of Strata's management, the location of Strata's primary assets, and the location of Strata's "nerve center."  Accordingly, to the best of the Petitioner's knowledge based on its review of Strata's books and records to date, the Petitioner submits that the following contacts demonstrate that Strata's center of main interests is Canada:

- Strata Energy—the parent company—is incorporated in Alberta, Canada;

- Strata's Head Office is located in Alberta, Canada;

- All strategic business decisions concerning Strata are made at, or otherwise issued from, the Head Office, including decisions related to financial and operational matters;

- Strata's directors are Canadian citizens and residents and work from the Head Office;

- Strata's marketing materials, including its website, identify Strata as a Canadian company;

- Strata held itself out to creditors as a Canadian company;

- Strata held board meetings in Alberta, Canada;

- Strata Energy files its tax returns with, and pays tax on its profits to, the Canada Revenue Agency;

- Strata's books and records are held in Alberta, Canada, including all of the Strata's data and servers;

- Strata Energy provided, among other things, services to Canadian clients at Canadian oilfields;

- Strata's primary bank accounts are maintained in Alberta, Canada; and

- The Petitioner is located in Ontario, Canada, so all decisions related to the Canadian Proceeding and these chapter 15 cases are made in Ontario, Canada.

44.     In addition, to the best of the Petitioner's knowledge based on its review of Strata's financial records to date, Strata owns assets with a net book value of CAD/USD $49 million as of November 10, 2015.  More than half of the net book value of Strata's equipment—approximately CAD $28 million—is located within Canada.  Strata's remaining equipment is split between Iraq (net book value of approximately CAD $11 million), the US (net book value of approximately $6 million), and other locations outside of Canada (net book value of approximately CAD $4 million).[8]  Further, as

---

[8]   As stated above, the foregoing asset values are merely book values found in Strata's financial records.  Based upon the results of the Petitioner's investigation to date, the Petitioner believes that the fair market value of Strata's assets is significantly less than their net book value and therefore, it is unlikely that any Sale of Strata's assets will generate enough value to satisfy Strata's secured debt.

mentioned above, all of Strata's approximately CAD $27 million in secured debt was

obtained through Canadian financings from Canadian lenders—primarily, PNC Bank and

BDC Capital.  Also, the Petitioner believes—based on its review of Strata's financial

records to date—that the majority of Strata Energy's approximately CAD $4,433,357 in

unsecured trade debt is due and owing to Canadian creditors.

**F.**     **Strata's US Operations, Assets, and Liabilities**

45.     To the best of the Petitioner's knowledge, Strata Energy and Strata

International operate as a thoroughly integrated enterprise.  Accordingly, Strata Energy

(through Strata International) conducts some operations in various jurisdictions within the

US.  The location and amount of Strata Energy's US activity varies depending on the

needs of Strata Energy's clients and to the extent any such client awards a given project

to Strata Energy.  Currently, Strata Energy is working on projects in both Wyoming and

Ohio.   To support its US operations, Strata Energy (through Strata International)

maintains an administrative office and equipment facility (the "US Facility") in

Cheyenne, Wyoming.  The US Facility is Strata Energy's sole US office, and also serves

as an equipment-repair facility and storage yard.[9]  Strata International has five US

employees, all of whom work out of the US Facility: Trent Nell (General Manager),

---

[9]     Strata Energy also has two "micro operating bases" in the US: one in Texas and the
other in Ohio.  These locations primarily function as storage facilities and do not have
a regular staff; however, these "micro operating bases" are used by "field employees"
to the extent required when Strata Energy has been engaged to provide services on a
project within the area.

-18-

Tome Liles (Shop Forman), Garrett Grey (Equipment Technician), Shanon Knowlton (Accounting), and Joshua Logan (Sales).[10]

46.    To the best of the Petitioner's knowledge, Strata Energy has certain US assets to which Strata International holds legal title.  These assets consist primarily of (i) oilfield-services and related equipment and (ii) accounts receivable in connection with Strata's US operations.  To the best of the Petitioner's knowledge based on its review of Strata's financial records to date, as of November 10, 2015, Strata Energy held the following US assets:

| Asset Class | Net Book Value (USD) |
|---|---|
| Accounts Receivable | $1,609,789 |
| Equipment | $1,008,841 |
| Inventory | $628,281 |
| Vehicles | $196,879 |
| Prepaid Expenses | $53,091 |
| Leases | $25,996 |
| Furniture and Fixtures | $15,012 |
| Hardware/Software | $12,644 |
| **Total** | **$3,550,533** |

Substantially all of the above assets are located at the US Facility.[11]

---

[10]    In addition, Strata Energy has 18 "field employees" in the US.  The field employees provide oilfield services and operate equipment on Strata Energy's behalf, and are staffed on projects on an "as-needed" basis, without regard to the geographic location of either the given project or the residence of the field employee.

[11]    As stated above, the foregoing asset values are merely book values found in Strata's financial records.  Again, based upon the results of the Petitioner's investigation to date, the Petitioner believes that the fair market value of Strata's assets is significantly

47.     Further, as mentioned above, Strata International's US operations were funded entirely through secured debt obtained from Canadian lenders—PNC Bank and BDC Capital—in the aggregate amount of CAD $27,505,223.  However, though the Petitioner does not yet know nature, extent, and validity of its claim, Wells Fargo has filed a statement asserting a security interest and/or lien with respect to Strata International's assets in the US.  Further, based on a preliminary review of Strata's books and records, the Petitioner estimates that Strata International has approximately $653,122 in unsecured trade debt owing to various US and Canadian creditors.

### MOTIONS

48.     In furtherance of the above-outlined objectives, the Petitioner has filed a number of motions and proposed orders and respectfully requests that the Court consider entering the proposed orders granting such motions.  I have reviewed each of the motions and proposed orders (including any exhibits thereto) and the facts set forth there are true and correct to the best of my knowledge, information and belief.

**A.    Verified Petitions For Recognition of Canadian Proceeding and Motion For Order Granting Related Relief**

49.     The Petitioner has also filed, concurrently herewith, verified petitions for the Debtors seeking recognition of the Canadian Proceeding and a motion for an order granting related relief (collectively, the "Verified Petition").  As set forth in the Verified Petition, this Court should recognize the Canadian Proceeding as a "foreign main

---

less than their net book value and therefore, it is unlikely that any Sale of Strata's assets will generate enough value to satisfy Strata's secured debt.

proceeding", as defined in section 1502(4) of the Bankruptcy Code.  In the alternative, this Court should recognize the Canadian Proceeding as a "foreign non-main proceeding", as defined in section 1502(4) of the Bankruptcy Code.

50.     I understand that the Bankruptcy Code provides that a foreign proceeding is a "foreign main proceeding" if it is pending in the country where the debtor has its "center of main interests," and a foreign proceeding is a "foreign non-main proceeding" if it is pending in the country where the debtor has an "establishment," defined as a place of operations where the debtor "carries out a nontransitory economic activity." *See* 11 U.S.C. §§ 1517(b)(1)-(b)(2), § 1502(2).

51.     As set forth in paragraphs 43 and 44 above, Canada is the center of main interests for each of the Debtors.  At the very least, both Strata Energy (the Canadian parent company) and Strata International (the US subsidiary) conduct nontransitory economic activities in Canada and thus, have "establishments" in Canada within the meaning of section 1502(2) of the Bankruptcy Code.

52.     By the Verified Petition, the Petitioner also requests entry of a proposed order that, among other things, (i) stays execution against the Debtors' assets, (ii) entrusts the administration, realization, and distribution of any and all Property located in the US to the Petitioner, in order to protect, preserve, and maximize the value of assets, (iii) suspends the right of any party save the Petitioner to transfer, encumber or otherwise dispose of any interest of Strata in property located within the US, and (iv) provides for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities.

-21-

53.     Accordingly, based on the foregoing, I urge the Court to grant the relief requested in the Verified Petition, as I believe such relief to be vital to a successful monetization of the Debtors' assets through a Sale, and therefore, is in the best interests of the Debtors and their creditors.

### B.     Motion for Joint Administration of the Debtors' Chapter 15 Cases

54.     The Petitioner has filed a motion to jointly administer these chapter 15 cases (the "Joint Administration Motion"). I believe that joint administration is warranted in these cases. The Debtors are affiliated entities with closely related financial affairs and business operations, and joint administration will ease the administrative burden on the Court and the parties.  I anticipate that the various notices, applications, motions, other pleadings, hearings and orders in these cases will affect each of the Debtors.  The failure to administer these cases jointly would result in duplicative pleadings and service. Such unnecessary duplication would impose avoidable expenses on all parties.

55.     Joint administration will permit this Court to use a single docket for the jointly administered cases and combine notices to creditors and other parties in interest of the Debtors.  Joint administration will also protect parties in interest by ensuring that they will be appropriately apprised of all matters. Accordingly, I believe entry of an order granting the relief requested in the Joint Administration Motion is in the best interests of the Debtors and all parties in interest.

**C.**   ***Ex Parte* Motion to (I) Schedule Hearing Regarding Verified Chapter 15 Petitions and Joint Administration Motion and (II) Specifying Form and Manner of Service of Notice**

56.     The Petitioner has filed a motion (the "Notice Motion" together with the Joint Administration Motion, the "Motions") to (i) schedule a hearing on the Verified Petition for recognition and the Joint Administration Motion and (ii) specify the form and manner of service of notice of the Verified Petition, the Joint Administration Motion, and other related pleadings involving the Debtors' chapter 15 cases.

57.     The Debtors have creditors, potential creditors, and other parties in interest, all of which need to be provided with, among other things, notice of the filing of these chapter 15 cases, the proposed Recognition Order relating to the Verified Petition, the deadline to object to the Verified Petition, and the hearing on the Verified Petition. Under the facts and circumstances of these chapter 15 cases, it is my belief that service of the notice in the manner proposed in the Notice Motion will provide the Debtors' various parties in interest due and sufficient notice and service of such matters and any associated objection deadline and hearing dates.

58.     Accordingly, I believe entry of an order granting the relief requested in the Notice Motion is in the best interests of the Debtors and all parties in interest.

## CONCLUSION

59.     Based on the foregoing, I believe that the relief requested in the Verified Petition and the Motions is well justified, necessary to the success of the Canadian Proceeding, and in the best interests of the Debtors and their creditors and should be granted in full.

-23-

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this *13* day of December 2015
in Ontario, Canada.

THE FULLER LANDAU GROUP INC.,
in its capacity as the Debtors' appointed
receiver and duly authorized foreign
representative

_____

Name: Ken Pearl
Title: Senior Vice President

85597977\V-2

**Exhibit A**

**(Receivership Order)**

*A true copy of this to be a true copy of*
*the original* ___Order___ ___

*Dated this* _10_ *day of* _Nov 2015_ ___

_____
*for Clerk of the Court*

*Execution Version*

Clerk's stamp:

*[Seal: JUDICIAL CENTRE OF CALGARY — FILED NOV 10 2015 — CLERK OF THE COURT]*

COURT FILE NUMBER:            **1501-12233**

COURT OF QUEEN'S BENCH OF ALBERTA

JUDICIAL CENTRE                  **CALGARY**

                                 **IN THE MATTER OF THE BANKRUPTCY AND
                                 INSOLVENCY OF STRATA ENERGY SERVICES
                                 INC. and STRATA SERVICES INTERNATIONAL
                                 INC.**

APPLICANT:                       **PNC BANK CANADA BRANCH**

RESPONDENT(S):                   **STRATA ENERGY SERVICES INC. and STRATA
                                 SERVICES INTERNATIONAL INC.**

DOCUMENT:                        <u>**CONSENT RECEIVERSHIP ORDER**</u>

                                 **Blake Cassels & Graydon LLP**
                                 3500, 855-2nd street S.W.
                                 Calgary, Alberta T2P4J8
                                 Attention: Kelly Bourassa/Ryan Zahara

                                 Telephone:   403-260-9697/9628
                                 Facsimile:   403-260-9700
                                 Email:       kelly.bourassa@blakes.com/
                                              ryan.zahara@blakes.com

                                 File No.:    57409/90007

**DATE ON WHICH ORDER WAS PRONOUNCED:**        November 10, 2015

**NAME OF JUDGE WHO MADE THIS ORDER:**         The Honourable Justice P.R. Jeffrey

**LOCATION OF HEARING:**                       Calgary Courts Centre

    **UPON** the application of PNC Bank Canada Branch ("**PNC**") in respect of Strata Energy

Services Inc., as borrower and Strata Services International Inc., as guarantor (collectively, the

"**Debtor**"); **AND UPON** having read the Application, the Affidavit of Robert Fasken, filed; and

the Affidavit of Service of Carol Benish, filed; **AND UPON** reading the consent of The Fuller

Landau Group Inc. to act as receiver and manager ("**Receiver**") of the Debtor, filed; **AND**

**UPON** noting the consent endorsed hereon of Travis Lysak, as counsel to the Debtor; **AND UPON** hearing counsel for PNC; **IT IS HEREBY ORDERED AND DECLARED THAT:**

## SERVICE

1.      The time for service of the notice of application for this order is hereby abridged and service thereof is deemed good and sufficient.

## APPOINTMENT

2.      Pursuant to section 243(1) of the *Bankruptcy and Insolvency Act*, RSC 1985, c B-3 ("**BIA**"), The Fuller Landau Group Inc. is hereby appointed Receiver, without security, of all of the Debtor's current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate, including all proceeds thereof (the "**Property**").

## RECEIVER'S POWERS

3.      The Receiver is hereby empowered and authorized, but not obligated, to act at once in respect of the Property and, without in any way limiting the generality of the foregoing, the Receiver is hereby expressly empowered and authorized to do any of the following where the Receiver considers it necessary or desirable:

(a)      to take possession of and exercise control over the Property and any and all proceeds, receipts and disbursements arising out of or from the Property;

(b)      to receive, preserve and protect the Property, or any part or parts thereof, including, but not limited to, the changing of locks and security codes, the relocating of Property to safeguard it, the engaging of independent security personnel, the taking of physical inventories and the placement of such insurance coverage as may be necessary or desirable;

(c)      to manage, operate and carry on the business of the Debtor, including the powers to enter into any agreements, incur any obligations in the ordinary course of business, cease to carry on all or any part other business, or cease to perform any contracts of the Debtor;

(d)   to engage consultants, appraisers, agents, experts, auditors, accountants, managers, counsel and such other persons from time to time and on whatever basis, including on a temporary basis, to assist with the exercise of the Receiver's powers and duties, including without limitation those conferred by this Order;

(e)   to purchase or lease machinery, equipment, inventories, supplies, premises or other assets to continue the business of the Debtor or any part or parts thereof;

(f)   to receive and collect all monies and accounts now owed or hereafter owing to the Debtor and to exercise all remedies of the Debtor in collecting such monies, including, without limitation, to enforce any security held by the Debtor;

(g)   to settle, extend or compromise any indebtedness owing to or by the Debtor;

(h)   to execute, assign, issue and endorse documents of whatever nature in respect of any of the Property, whether in the Receiver's name or in the name and on behalf of the Debtor, for any purpose pursuant to this Order;

(i)   to undertake environmental or workers' health and safety assessments of the Property and operations of the Debtor;

(j)   to initiate, prosecute and continue the prosecution of any and all proceedings and to defend all proceedings now pending or hereafter instituted with respect to the Debtor, the Property or the Receiver, and to settle or compromise any such proceedings. The authority hereby conveyed shall extend to such appeals or applications for judicial review in respect of any order or judgment pronounced in any such proceeding, and provided further that nothing in this Order shall authorize the Receiver to defend or settle the action in which this Order is made unless otherwise directed by this Court.

(k)   to market any or all the Property, including advertising and soliciting offers in respect of the Property or any part or parts thereof and negotiating such terms and conditions of sale as the Receiver in its discretion may deem appropriate.

(l)   to sell, convey, transfer, lease or assign the Property or any part or parts thereof out of the ordinary course of business,

(i)     subject to subparagraph (iii) below, without the approval of this Court in respect of any transaction not exceeding $100,000, provided that the aggregate consideration for all such transactions does not exceed $500,000;

(ii)    with the approval of this Court in respect of any transaction in which the purchase price or the aggregate purchase price exceeds the applicable amount set out in the preceding clause; and

(iii)   notwithstanding subparagraph (i) above, all sales of intellectual property of the Debtor shall be subject to approval of this Court,

and in each such case notice under subsection 60(8) of the *Personal Property Security Act*, RSA 2000, c P-7 shall not be required.

(m)    to apply for any vesting order or other orders necessary to convey the Property or any part or parts thereof to a purchaser or purchasers thereof, free and clear of any liens or encumbrances affecting such Property;

(n)    to report to, meet with and discuss with such affected Persons (as defined below) as the Receiver deems appropriate all matters relating to the Property and the receivership, and to share information, subject to such terms as to confidentiality as the Receiver deems advisable;

(o)    to register a copy of this Order and any other Orders in respect of the Property against title to any of the Property;

(p)    to apply for any permits, licences, approvals or permissions as may be required by any governmental authority and any renewals thereof for and on behalf of and, if thought desirable by the Receiver, in the name of the Debtor;

(q)    to enter into agreements with any trustee in bankruptcy appointed in respect of the Debtor, including, without limiting the generality of the foregoing, the ability to enter into occupation agreements for any property owned or leased by the Debtor;

(r)    to exercise any shareholder, partnership, joint venture or other rights which the Debtor may have;

(s)    upon the application of the Receiver to this Court upon notice to all interested parties, and where the Court is of the opinion on the making of such application that it is proper and in the best interests of the estate, to assign the Debtor into bankruptcy or to obtain a bankruptcy order against the Debtor; and

(t)    to take any steps reasonably incidental to the exercise of these powers or the performance of any statutory obligations;

and in each case where the Receiver takes any such actions or steps, it shall be exclusively authorized and empowered to do so, to the exclusion of all other Persons (as defined below), including the Debtor, and without interference from any other Person.

## DUTY TO PROVIDE ACCESS AND CO-OPERATION TO THE RECEIVER

4.    (i) The Debtor, (ii) all of its current and former directors, officers, employees, agents, accountants, legal counsel and shareholders, and all other persons acting on its instructions or behalf, and (iii) all other individuals, firms, corporations, governmental bodies or agencies, or other entities having notice of this Order (all of the foregoing, collectively, being **"Persons"** and each being a **"Person"**) shall forthwith advise the Receiver of the existence of any Property in such Person's possession or control, shall grant immediate and continued access to the Property to the Receiver, and shall deliver all such Property (excluding Property subject to liens the validity of which is dependent on maintaining possession) to the Receiver upon the Receiver's request.

5.    All Persons shall forthwith advise the Receiver of the existence of any books, documents, securities, contracts, orders, corporate and accounting records, and any other papers, records and information of any kind related to the business or affairs of the Debtor, and any computer programs, computer tapes, computer disks, or other data storage media containing any such information (the foregoing, collectively, the **"Records"**) in that Person's possession or control, and shall provide to the Receiver or permit the Receiver to make, retain and take away copies thereof and grant to the Receiver unfettered access to and use of accounting, computer, software and physical facilities relating thereto, provided however that nothing in this paragraph 5 or in paragraph 6 of this Order shall require the delivery of Records, or the granting of access to Records, which may not be

disclosed or provided to the Receiver due to the privilege attaching to solicitor-client communication or documents prepared in contemplation of litigation or due to statutory provisions prohibiting such disclosure.

6.  If any Records are stored or otherwise contained on a computer or other electronic system of information storage, whether by independent service provider or otherwise, all Persons in possession or control of such Records shall forthwith give unfettered access to the Receiver for the purpose of allowing the Receiver to recover and fully copy all of the information contained therein whether by way of printing the information onto paper or making copies of computer disks or such other manner of retrieving and copying the information as the Receiver in its discretion deems expedient, and shall not alter, erase or destroy any Records without the prior written consent of the Receiver. Further, for the purposes of this paragraph, all Persons shall provide the Receiver with all such assistance in gaining immediate access to the information in the Records as the Receiver may in its discretion require including providing the Receiver with instructions on the use of any computer or other system and providing the Receiver with any and all access codes, account names and account numbers that may be required to gain access to the information.

## NO PROCEEDINGS AGAINST THE RECEIVER

7.  No proceeding or enforcement process in any court or tribunal (each, a "**Proceeding**"), shall be commenced or continued against the Receiver except with the written consent of the Receiver or with leave of this Court.

## NO PROCEEDINGS AGAINST THE DEBTOR OR THE PROPERTY

8.  No Proceeding against or in respect of the Debtor or the Property shall be commenced or continued except with the written consent of the Receiver or with leave of this Court and any and all Proceedings currently under way against or in respect of the Debtor or the Property are hereby stayed and suspended pending further Order of this Court, provided, however, that nothing in this Order shall: (i) prevent any Person from commencing a proceeding regarding a claim that might otherwise become barred by statute or an existing agreement if such proceeding is not commenced before the expiration of the stay

provided by this paragraph 8; and (ii) affect a Regulatory Body's investigation in respect of the debtor or an action, suit or proceeding that is taken in respect of the debtor by or before the Regulatory Body, other than the enforcement of a payment order by the Regulatory Body or the Court. **"Regulatory Body"** means a person or body that has powers, duties or functions relating to the enforcement or administration of an Act of Parliament or of the legislature of a province.

## NO EXERCISE OF RIGHTS OF REMEDIES

9.    All rights and remedies (including, without limitation, set-off rights) against the Debtor, the Receiver, or affecting the Property, are hereby stayed and suspended except with the written consent of the Receiver or leave of this Court, provided however that nothing in this paragraph shall (i) empower the Receiver or the Debtor to carry on any business which the Debtor is not lawfully entitled to carry on, (ii) exempt the Receiver or the Debtor from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

## NO INTERFERENCE WITH THE RECEIVER

10.    No Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Debtor, without written consent of the Receiver or leave of this Court.

## CONTINUATION OF SERVICES

11.    All Persons having oral or written agreements with the Debtor or statutory or regulatory mandates for the supply of goods and/or services, including without limitation, all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation services, utility or other services to the Debtor are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Receiver, and this Court directs that the Receiver shall be entitled to the continued use of the Debtor's current telephone numbers, facsimile numbers, internet addresses and

domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Receiver in accordance with normal payment practices of the Debtor or such other practices as may be agreed upon by the supplier or service provider and the Receiver, or as may be ordered by this Court.

## RECEIVER TO HOLD FUNDS

12. All funds, monies, cheques, instruments, and other forms of payments received or collected by the Receiver from and after the making of this Order from any source whatsoever, including without limitation the sale of all or any of the Property and the collection of any accounts receivable in whole or in part, whether in existence on the date of this Order or hereafter coming into existence, shall be deposited into one or more new accounts to be opened by the Receiver (the "**Post Receivership Accounts**") and the monies standing to the credit of such Post Receivership Accounts from time to time, net of any disbursements provided for herein, shall be held by the Receiver to be paid in accordance with the terms of this Order or any further order of this Court.

## EMPLOYEES

13. Subject to employees' rights to terminate their employment, all employees of the Debtor shall remain the employees of the Debtor until such time as the Receiver, on the Debtor's behalf, may terminate the employment of such employees. The Receiver shall not be liable for any employee-related liabilities, including any successor employer liabilities as provided for in section 14.06(1.2) of the BIA, other than such amounts as the Receiver may specifically agree in writing to pay, or in respect of its obligations under sections 81.4(5) or 81.6(3) of the BIA or under the *Wage Earner Protection Program Act*, SC 2005, c 47 ("**WEPPA**").

14. Pursuant to clause 7(3)(c) of the *Personal Information Protection and Electronic Documents Act*, SC 2000, c 5, the Receiver shall disclose personal information of identifiable individuals to prospective purchasers or bidders for the Property and to their advisors, but only to the extent desirable or required to negotiate and attempt to complete one or more sales of the Property (each, a "**Sale**"). Each prospective purchaser or bidder

to whom such personal information is disclosed shall maintain and protect the privacy of such information and limit the use of such information to its evaluation of the Sale, and if it does not complete a Sale, shall return all such information to the Receiver, or in the alternative destroy all such information. The purchaser of any Property shall be entitled to continue to use the personal information provided to it, and related to the Property purchased, in a manner which is in all material respects identical to the prior use of such information by the Debtor, and shall return all other personal information to the Receiver, or ensure that all other personal information is destroyed.

## LIMITATION ON ENVIRONMENTAL LIABILITIES

15.    (a)    Notwithstanding anything in any federal or provincial law, the Receiver is not personally liable in that position for any environmental condition that arose or environmental damage that occurred:

        (i)    before the Receiver's appointment; or

        (ii)    after the Receiver's appointment unless it is established that the condition arose or the damage occurred as a result of the Receiver's gross negligence or wilful misconduct.

    (b)    Nothing in sub-paragraph (a) exempts a Receiver from any duty to report or make disclosure imposed by a law referred to in that sub-paragraph.

    (c)    Notwithstanding anything in any federal or provincial law, but subject to sub-paragraph (a) hereof, where an order is made which has the effect of requiring the Receiver to remedy any environmental condition or environmental damage affecting the Property, the Receiver is not personally liable for failure to comply with the order, and is not personally liable for any costs that are or would be incurred by any person in carrying out the terms of the order,

        (i)    if, within such time as is specified in the order, within 10 days after the order is made if no time is so specified, within 10 days after the appointment of the Receiver, if the order is in effect when the Receiver is appointed, or during the period of the stay referred to in clause (ii) below, the Receiver:

A. complies with the order, or

B. on notice to the person who issued the order, abandons, disposes of or otherwise releases any interest in any real property affected by the condition or damage;

(ii) during the period of a stay of the order granted, on application made within the time specified in the order referred to in clause (i) above, within 10 days after the order is made or within 10 days after the appointment of the Receiver, if the order is in effect when the Receiver is appointed, by,

A. the court or body having jurisdiction under the law pursuant to which the order was made to enable the Receiver to contest the order; or

B. the court having jurisdiction in bankruptcy for the purposes of assessing the economic viability of complying with the order; or

(iii) if the Receiver had, before the order was made, abandoned or renounced or been divested of any interest in any real property affected by the condition or damage.

## LIMITATION ON THE RECEIVER'S LIABILITY

16. Except for gross negligence or wilful misconduct, as a result of its appointment or carrying out the provisions of this Order the Receiver shall incur no liability or obligation that exceeds an amount for which it may obtain full indemnity from the Property. Nothing in this Order shall derogate from any limitation on liability or other protection afforded to the Receiver under any applicable law, including, without limitation, section 14.06, 81.4(5) or 81.6(3) of the BIA.

## RECEIVER'S ACCOUNTS

17. The Receiver and counsel to the Receiver shall be paid their reasonable fees and disbursements, in each case, incurred at their standard rates and charges. The Receiver and counsel to the Receiver shall be entitled to and are hereby granted a charge (the **"Receiver's Charge"**) on the Property, as security for such fees and disbursements,

incurred both before and after the making of this Order in respect of these proceedings, and the Receiver's Charge shall form a first charge on the Property in priority to all security interests, trusts, liens, charges and encumbrances, statutory or otherwise, in favour of any Person but subject to section 14.06(7), 81.4(4) and 81.6(2) of the BIA.

18.     The Receiver and its legal counsel shall pass their accounts from time to time.

19.     Prior to the passing of its accounts, the Receiver shall be at liberty from time to time to apply reasonable amounts, out of the monies in its hands, against its fees and disbursements, including the legal fees and disbursements, incurred at the normal rates and charges of the Receiver or its counsel, and such amounts shall constitute advances against its remuneration and disbursements when and as approved by this Court.

## FUNDING OF THE RECEIVERSHIP

20.     The Receiver be at liberty and it is hereby empowered to borrow by way of a revolving credit or otherwise, such monies from time to time as it may consider necessary or desirable, provided that the outstanding principal amount does not exceed $1,000,000 (or such greater amount as this Court may by further Order authorize) at any time, at such rate or rates of interest as it deems advisable for such period or periods of time as it may arrange, for the purpose of funding the exercise of the powers and duties conferred upon the Receiver by this Order, including interim expenditures.  The whole of the Property shall be and is hereby charged by way of a fixed and specific charge (the "**Receiver's Borrowings Charge**") as security for the payment of the monies borrowed, together with interest and charges thereon, in priority to all security interests, trusts, liens, charges and encumbrances, statutory or otherwise, in favour of any Person, but subordinate in priority to the Receiver's Charge and the charges set out in sections 14.06(7), 81.4(4) and 81.6(2) of the BIA.

21.     Neither the Receiver's Borrowings Charge nor any other security granted by the Receiver in connection with its borrowings under this Order shall be enforced without leave of this Court.

22.     The Receiver is at liberty and authorized to issue certificates substantially in the form annexed as Schedule "**A**" hereto (the "**Receiver's Certificates**") for any amount borrowed by it pursuant to this Order.

23.     The monies from time to time borrowed by the Receiver pursuant to this Order or any further order of this Court and any and all Receiver's Certificates evidencing the same or any part thereof shall rank on a *pari passu* basis, unless otherwise agreed to by the holders of any prior issued Receiver's Certificates.

## ALLOCATION

24.     Any interested party may apply to this Court on notice to any other party likely to be affected, for an order allocating the Receiver's Charge and Receiver's Borrowings Charge amongst the various assets comprising the Property.

## GENERAL

25.     The Receiver may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

26.     Notwithstanding Rule 6.11 of the *Alberta Rules of Court*, unless otherwise ordered by this Court, the Receiver will report to the Court from time to time, which reporting is not required to be in affidavit form and shall be considered by this Court as evidence.

27.     Nothing in this Order shall prevent the Receiver from acting as a trustee in bankruptcy of the Debtor.

28.     This Court hereby requests the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States to give effect to this Order and to assist the Receiver and its agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Receiver, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Receiver and its agents in carrying out the terms of this Order.

29.   The Receiver be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order and that the Receiver is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

30.   Further, and without limitation, the Receiver is hereby specifically authorized and empowered to: (i) act as the "foreign representative" in respect of these proceedings as that term is used in section 101(24) of title 11 of the United States Code; (ii) seek recognition of these proceedings in foreign jurisdictions, including, without limitation, pursuant to chapter 15 of title 11 of the United States Code; (iii) seek foreign recognition of any orders made by this Court in these proceedings as the Receiver may determine appropriate; and (iv) seek any other appropriate relief from foreign courts as the Receiver deems just and proper.

31.   The Plaintiff shall have its costs of this motion, up to and including entry and service of this Order, provided for by the terms of the Plaintiff's security or, if not so provided by the Plaintiff's security, then on a substantial indemnity basis to be paid by the Receiver from the Debtor's estate with such priority and at such time as this Court may determine.

32.   Any interested party may apply to this Court to vary or amend this Order on not less than 7 days' notice to the Receiver and to any other party likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

**FILING**

33.   The Receiver shall establish and maintain a website in respect of these proceedings at http://fullerllp.com/strata and shall post there as soon as practicable:

(a)    all materials prescribed by statue or regulation to be made publically available; and

(b)    all applications, reports, affidavits, orders and other materials filed in these proceedings by or on behalf of the Receiver, or served upon it, except such materials as are confidential and the subject of a sealing order or pending application for a sealing order.

_____
Justice of the Court of Queen's Bench of Alberta

Consented to this _____ day of May, 2015

**STRATA ENERGY SERVICES INC.**

Per:    _____
Name:
Title:        TRAVIS LYSAK
            BARRISTER & SOLICITOR

Consented to this _____ day of May, 2015

**STRATA SERVICES INTERNATIONAL INC.**

Per:    _____
Name:
Title:        TRAVIS LYSAK
            BARRISTER & SOLICITOR

## SCHEDULE "A"

## RECEIVER CERTIFICATE

CERTIFICATE NO. _____

AMOUNT           $ _____

1.      THIS IS TO CERTIFY that THE FULLER LANDAU GROUP INC., the receiver (the "**Receiver**") of all of the assets, undertakings and properties of Strata Energy Services Inc. and Strata Services International Inc. appointed by Order of the Court of Queen's Bench of Alberta (the "**Court**") dated the 10th day of November, 2015 (the "**Order**") made in action number 1501-12233, has received as such Receiver from the holder of this certificate (the "**Lender**") the principal sum of $_____, being part of the total principal sum of $1,000,000 which the Receiver is authorized to borrow under and pursuant to the Order.

2.      The principal sum evidenced by this certificate is payable on demand by the Lender with interest thereon calculated and compounded [daily] [monthly not in advance on the _____ day of each month] after the date hereof at a notional rate per annum equal to the rate of _____ per cent above the prime commercial lending rate of Bank of _____ from time to time.

3.      Such principal sum with interest thereon is, by the terms of the Order, together with the principal sums and interest thereon of all other certificates issued by the Receiver pursuant to the Order or to any further order of the Court, a charge upon the whole of the Property, in priority to the security interests of any other person, but subject to the priority of the charges set out in the Order and the *Bankruptcy and Insolvency Act*, and the right of the Receiver to indemnify itself out of such Property in respect of its remuneration and expenses.

4.      All sums payable in respect of principal and interest under this certificate are payable at the main office of the Lender at _____.

5.      Until all liability in respect of this certificate has been terminated, no certificates creating charges ranking or purporting to rank in priority to this certificate shall be issued by the Receiver to any person other than the holder of this certificate without the prior written consent of the holder of this certificate.

6.      The charge securing this certificate shall operate so as to permit the Receiver to deal with the Property) as authorized by the Order and as authorized by any further or other order of the Court.

7.    The Receiver does not undertake, and it is not under any personal liability, to pay any sum in respect of which it may issue certificates under the terms of the Order.

DATED the _____ day of _____, 20__.

THE FULLER LANDAU GROUP INC., solely in its capacity as Receiver of the Property (as defined in the Order), and not in its personal capacity

Per:    _____
Name:
Title: